May I please the Court, Jonathan Cohn for Appellant Monsanto. Your Honors, the Court below made at least three reversible legal errors. 1. On causation, the Court adopted a unique theory, which the Court itself described as novel and which improperly conflated proximate cause with foreseeability. 2. On compensatory damages, the Court disregarded the Zuri precedent simply because it's aged. And 3. On punitive damages, the Court ventured well beyond established limits and permitted punishment when the parties followed the regulatory regime. The net result of these mistakes is a $75 million judgment for alleged damage to fruit trees caused by the illegal conduct of third parties that disregarded warnings and used a product that Monsanto did not even manufacture or sell. This Court should reverse. If it's okay with your Honors, I'd like to begin with the issue of causation. And on this question, the District Court originally decided it correctly, dismissing plaintiff's claims, but the Court later adopted its novel theory, self-described novel theory, which held us liable for third-party misuse of a fourth party's product. The Court did this. The Court adopted its novel theory, despite acknowledging the absence of any case upholding it, despite observing that surely the intervening conduct or warnings or both would cut the chain of proximate cause, and despite agreeing that Monsanto had legitimate reasons for releasing the seed when we did, in light of the superior germ plasm and strong agricultural and consumer demand. But the District Court brushed aside all of these issues because it mistakenly applied a pure foreseeability test. And this is legal error. Well, counsel, let me let me interrupt you. I don't think the District Court brushes aside anything. But getting past the quibble, let me get to the real point of this, which is simply this. When you look at your marketing, your defensive marketing, protect yourself from your neighbor, you know, you're very familiar with the evidence against you. And this went to a jury, right? And we put all that together. How novel is it? Because you not only, unlike the Ashley Arkansas case, you not only knew about it, you propagated it. You planted it and propagated it. And so it was all part of the system. I think that's the reason the District Court here, who's a cautious district judge, changed his mind. Your Honor, a couple of things, first on the law and then on the facts. On the law, the court still conflated proximate cause with foreseeability. The only way he could affirm the decision below is by saying proximate cause is foreseeability. He said it's a pure foreseeability test, which is diametrically opposite to Missouri case law. It's not a pure foreseeability test. Missouri Supreme Court could not be more clear that Missouri, like other states, has not applied a pure foreseeability test. But getting to the facts, Your Honor, we never encouraged anyone to use illegal dicamba. The court itself, District Court, said that very thing on page 1053 of the record. We never encouraged anyone to do anything illegally. Is it possible the parties profited? Possibly. But the same thing was true in Ashley County, where the drug manufacturers profited from the illegal conduct. We didn't encourage anyone to do anything illegally. We warned against it. We had warnings. We had education. We had training. We had rebates. We did far more than in Ashley County, where the defendants- Well, what about the evidence that you had deals, different kinds of franchise deals and different kinds of contracts and all, and you didn't enforce anything when you knew that this was happening? What about that evidence? That goes to the license. On page 267 of the record, it is clear we did not have the power to revoke any licenses for a third party's misuse of another manufacturer's product. We couldn't have done it. And plus, there's also an enforceability issue. So let's take the four growers that Mr. Bader talks about in his brief. Two of those growers, only two would talk to us. The others wouldn't. One lawyered up after Mr. Bader sent a demand letter, and he wouldn't talk to us. Of the two who talked to us, they were cleared of wrongdoing by the Missouri Department of Agriculture. And then for the other ones, we couldn't get on their land. They wouldn't talk to us. We have less power than the government does. We can't just trespass in someone's land and do an investigation. So we worked with the states. We supported the states. But we couldn't do more. We couldn't revoke the licenses. Again, page 267, we couldn't do that. We did far more, again, than what was done in Ashley County, what was done in Moretta. And the mere fact that there might be some down-chain benefit is not enough to pin us on causation, because we warned against it. We warned against it. We educated. We trained. We provided rebates. By contrast, in Ashley County, the drug manufacturers profited because they created and maintained regulatory loopholes. They didn't provide the warnings. They didn't provide the rebates. They didn't take the actions that we did. And the court nonetheless said, as a matter of law, on the pleadings, you cannot impose liability because of a matter of public policy. And this gets back to the fundamental error of the district court, which conflated proximate cause with foreseeability. According to— Counsel, this is Judge Smith. What's your best—you state the clarity of Missouri law—what's your best Missouri case that would tell us that there was legal error by the district court? I would say Zaft and Callahan and even Blanks. So Callahan and Blanks made clear that Missouri, like other states, has not applied a pure foreseeability test, which is diametrically opposite to what the district court said on pages 1053 and 1058 of the record, where it said the only test of any plaintiff's claims is foreseeability and all roads lead to foreseeability. Those statements are diametrically opposite to Callahan and Blanks. They're also opposite to this court's decision in Ashley County, opposite to the U.S. Supreme Court's decision in Bank of America versus Miami, because proximate cause is not a foreseeability test. But there are two problems here, Your Honor. One is that the district court held us liable despite the intervening illegal conduct of third parties. And two, the district court held us liable for someone else's product. And the best Missouri Supreme Court case on that issue, Your Honor, is Zaft. And the district court recognized that Zaft and Benjamin Moore were grounds for dismissing the strict liability claims of plaintiffs. But the district court made an error by saying there's a difference between strict liability and negligence. But that, of course, is directly opposite to what Zaft said, because Zaft included negligence claims. It included fundamentally the same claims that issue in this case. And Zaft said you cannot have any kind of market share liability. You have to have product ID. But what the district court did here actually went further than what the plaintiffs were asking for in Zaft, because in Zaft, the plaintiffs are simply asking for market share liability. Whereas in this case, the district court imposed full liability for everyone's misuse of everyone's DICAMPA, all the manufacturers' DICAMPA. There are many manufacturers, and the district court held us liable for all of that. That goes even beyond what the plaintiffs in Zaft and Benjamin Moore were seeking, which was just market share liability. So, Your Honor, there are two fundamental errors here. One, the district court held us liable for the intervening actions of third parties, because the district court said all that matters is foreseeability, which is wrong. And two, the court did away with the product ID requirement in Zaft and Benjamin Moore and held us liable for the injuries caused by other manufacturers' herbicides. So the court went two bridges too far. One, it jumped over superseding cause. And two, it jumped over Zaft and product ID. Counsel, what do we do with the district court's description of this as the system? So it's not just the product, but it's the creation of the market for this product. The creation of the market and then the commercialization. And that without the seed, there would be no way anybody could be using the DICAMPA. Isn't that kind of what the district court was getting at? Yes, Your Honor. Even if the court, though, were to redefine the product as the system, and that itself, we'd say is legally and factually unsupported, that wouldn't justify the novel theory of causation. That would establish the product, but it would not justify collapsing proximate cause into foreseeability. It would not justify eliminating the legal limits on causation that are well-grounded in public policy, reflecting that a company should not be the insurer for the entire industry because that creates perverse incentives. Perverse incentives in terms of incentivizing misconduct because the people engaging misconduct would not face the liability. And then disincentivizing safety measures and disincentivizing R&D because even with the safety measures, you're going to be held liable. Despite the R&D, you're going to be lit up for $60 million in punitive damages. That's the reason why you have these well-established legal limits grounded in public policy. Redefining the product as the system doesn't justify jettisoning decades, if not centuries, of common law precedent. And this is not just Missouri precedent. This is the common law from coast to coast. This is the common law in Missouri, Arkansas, and pretty much all the way across the country. Proximate cause is not the same thing as foreseeability. Counsel, I'll let you say it two or three times. If you read Callahan, written by a law professor, as you know, a former law professor, if you read Callahan, it's got a lot in there. And one thing he says is foreseeability is part of proximate cause. It's just where you chop it off, so to speak. So now you're saying they're completely different? Is that your position? Oh, not at all, Your Honor. It is part of it. There are different phrases. In Callahan, it said a sprinkling of foreseeability in proximate cause. Other cases will say paramount factor, but it's not the entirety. It's not a pure foreseeability test, and that's the problem. Counsel, what in the evidence is missing to complete what you say would be required to establish probable cause? What, in addition to foreseeability, would have been necessary to establish probable cause or, excuse me, proximate cause? What we're saying is you can't establish proximate cause because the two well-established common law legal limits, which are grounded in public policy. One, the product identification. Well, I'm not asking you. I'm asking you abstractly or. It's scary to be a lawyer in front of doing oral arguments. Someone's unmuted who needs to be muted. We encourage you not to interrupt. What I'm asking you is, just as an academic matter for what the law requires, what's required to establish probable cause or, excuse me, proximate causation? I mean, obviously, that is a fact-specific circumstance, but it would have been different if there was evidence that we actually were the one. Counsel, you're not answering my question. What did the law require to establish proximate causation based on the allegations in this case? We're saying there couldn't be proximate cause based on the allegations in this case. Originally, Your Honor, there was an allegation that we encouraged wrongdoing. That was a different issue, but plaintiffs provided no evidence that we encouraged wrongdoing, right? Page 1053 of the record, the district court said we did not encourage wrongdoing. Well, let's step outside of this case. What does Missouri law require to establish, in any case, proximate causation? It's a fact-specific determination. It takes into account the natural and probable consequences, but Missouri law recognizes there are legal limits when there's intervening conduct or a lack of product identification. So that's why we're far afield. Two bridges too far. But in any event, in this case, plaintiffs had an allegation which they could not prove. We did not encourage any wrongdoing. To the contrary, we warned against it. We told people not to do it. We had education. We had training. We did virtually everything we could to get people not to do this. This was not part of our marketing plan or business goal. We warned against it. I see that I'm deep into my rebuttal time. I was going to address compensatory and punitive damages. Mr. Katyal agreed that he would address those, but I couldn't get to it. I'm happy to answer any of your Honor's questions on proximate cause or compensatory damages, or I'm happy to reserve the rest of my time for rebuttal. All right. Feel free to reserve. All right. Mr. Katyal. Thank you, Judge Smith. It may please the court. Neil Katyal for BASF, and I'd like to reserve five minutes for rebuttal. I have three points. First, we agree with Mr. Cohn. Causation is legally lacking, both because of the product ID requirement and third-party illegal activity, which breaks the chain of causation. Judge Smith, Missouri law generally forbids third parties from being the proximate cause. Third parties break the chain of proximate causation. You say generally. What would be the exception to the general rule? So premises liability or special duties, things like that, but otherwise, that is the general rule. Our second point is that no punitive damages should have been assessed as there was no causation and the Lopez factors weren't met. And if any punitives were appropriate, $60 million is far excessive, and the district court erred by saddling BASF with a full joint liability for Monsanto's conduct. And third, the district court's compensatory damages were wrong because it misapplied Missouri damages law regarding fruit trees. And if I could, I'll start with punitives and a table set for just 30 seconds so that we're all on the same page. We don't believe any punitive damages were warranted, and our position is fully aligned with Monsanto, except for one issue of joint punitive liability. That issue is that the district court permitted punitive damages for only one thing, Monsanto's 2015 and 16 seed release, and it was stipulated that BASF had nothing to do with Monsanto's decision. So while we believe the district court violated due process on the Missouri statute by not providing the requisite individualized determination, I want to begin with the areas of commonality between us, which is that there's first, no punitive damages that should have been awarded under Lopez, and second, that the punitives far exceed due process. Now on Lopez, Missouri law makes it extremely rare to permit punitive damages in negligence cases. That's the Missouri Supreme Court decision in Lopez, and this is certainly not a case where a regulation or law was not followed by the parties. Indeed, this case is really the Alcorn case on steroids, and yet the Missouri Supreme Court in Alcorn reversed all punitive damages in a $120 million jury verdict on legal grounds. And here, those Lopez factors, like the harm to the third parties and the like, weren't met here either. So we think, regardless of the compensatories or causation, even if you wanted to get there, punitive damages should not have been awarded because Missouri law makes it exceptionally rare. Our next argument is that the punitive damage of a word of $60 million far exceeds the limits of federal due process. And the most important point we make in our brief is the one that Bader never answers, which is that the state farm decision by the United States Supreme Court, at page 525, says that when compensatory damages are large, then the outer limit is a one-to-one ratio or something like that. This isn't anything- Counsel, counsel, now be fair. They don't say that's a hard and fast rule, though, do they? Absolutely, Judge Benton. You're absolutely right. It's not a hard and fast rule. But I think what this court has looked to in determining whether or not to ever exceed the ratio, you look to whether or not there's intentional conduct or something like that. And here, it's not even close. I mean, this court in Andrasek said in the 15 years since the BMW versus Gore decision, you've only had three cases with more than $1 million in compensatory verdict. Here, you've got $15 million. Indeed, this court in Brown and Williamson held that a $4 million compensatory damage award was substantial when the cigarette company in that case had, quote, callous disregard for the adverse health consequences of smoking and highly reprehensible conduct. And even there, they reduced it to, Judge Benton, that one-to-one ratio. They knocked a $15 million award down to $5 million. That was your court. And we submit if that's the rule for Brown and Williamson, it is certainly the rule here. So we're not here, Judge Benton, arguing that it's an absolute rule of one-to-one. No, I think in Andrasek, you approved a four-to-one. Here, by the way, it's not even four-to-one. It's more like eight-to-one for a couple of reasons. One is BASS conduct here for the 2015 and 2016 period, which is the only relevant period is nil. And what the judge did, and Judge Benton, I absolutely agree, fabulous judge, did a lot of things right. But on this, he really got it wrong by saying that this was a four-to-one ratio because what he did was look to the full compensatory damage period from 2015 to 19 and aggregate all those damages. But the punitive damages period was far more limited under his own decision. It was only for 2015 to 2016. What about the fact that if you are a joint venturer, if you look at the Missouri statute and you look at the Missouri cases, I think if you're a joint venturer, it even survives due process. And especially given what you said to the jury, you know, in your different statements at trial, it seems to me that if you were a joint venturer, though, the damages would be OK. Now, I'm not saying four-to-one, but in some ratio. Go ahead. Punitive damages. So, Judge Benton, we have two arguments here. One is that regardless of joint venture or not, and whether you want to lump the two together, Monsanto and BSS conduct even together is still grossly excessive because it exceeds a one-to-one ratio. There is no case saying if you have a joint venture, you get to have a higher ratio or anything like that. Rather, the State Farm test is, are the compensatory damages substantial or not? And second, absolutely. We fundamentally disagree with the idea that just because something is a joint venture, that that means that you can saddle us with Monsanto's conduct. Remember, the district court. What do you do with that? What do you do with the Missouri statute? What do you have to Missouri cases? Help me. Yeah. So the Missouri statute helps us. So that's 0.067. And it says as follows, quote, the defendant shall only be severally liable for the percentage of punitive damages for which fault is attributed to such defendant by the trier effect. Okay. I'm talking about a different statute. I'm talking about the statute says joint. Well, it's cases that say joint ventureships like a partnership. And then the statute says partnership, everybody's liable. And even the law partners that weren't involved in the malpractice. Go ahead, Your Honor. We don't disagree that that's generally the rule, but not for punitive damages. And that's where Missouri statute is specific and where the cases that you're referring to like like Blue versus Rose, that's a 1986 case. This statute was passed in 2005. They don't have a single case, Your Honor, that says that a joint venture you can saddle us with someone else's conduct just because it's a joint venture. And were that to be true, it would run headlong into the United States Supreme Court's decision in Gore, which requires an individualized assessment of culpability. Okay. Now, the next hurdle I've got for you, and you may convince me on, is what about the statements to the jury? Boy, if you read those, it says if they're liable, we're liable. Oh, my goodness. There's a judicial estoppel. I won't tell you all the doctrines. Go ahead. Yes, Judge Ben, we fundamentally disagree with how those facts are laid out. So, first of all, we objected to joint liability nine months before the trial. That's ECF number 178. The district court then agreed. That's at appendix page 128. Indeed, it just quoted that .067 statute that I just read to you and dismissed, quote, plaintiff's claim for joint liability of any punitive damages award. Docket 119, Judge Benton, was always the rule in the case. To this day, it's never been taken back. So if there was any waiver here, it was by Bader by not seeking reversal of docket number 119. So the trial then proceeded under the rule of docket 119, and the jury instructions were then all about Monsanto's conduct. It was made in the shadow of docket 119. There was not a word about joint liability for punitive damages in this. And even after the verdict, when Bader finally sought joint punitive damages against us, we objected. That's appendix pages 884 to 914 on exactly this basis. Now, it's true, Judge Benton, in the closing argument, BASF described Bader's argument as saying they were trying to saddle us with punitive damages. We never said we agreed with that. And certainly, docket 119 was always the operative law. So both before and after, and during, we always had the same position. And certainly, it was up to them if they wanted to challenge docket 119. They never did so. And so for those reasons, we think the punitive damages award, even if you wanted to give some, you certainly couldn't give them to BASF for Monsanto's conduct. The last thing I just turned to briefly is the fruit trees and compensatory damages argument. Because for more than 100 years, Missouri courts have applied the, quote, well-settled rule that the measure of damages to fruit trees is the difference between the market value of the land before and after the injury. That's the Butcher case, the Doty case, things like that. And that was not the case. Well, what about the Cooley case, where the Cooley case separates owning the land from leasing land from just trees? And you know the long passage at 51 Southwest, 104. What about that passage? I'll get into that, Judge Benton, and then if I could reserve the rest of my time. That's a very different case. That's a breach of contract case, where the contract itself provided for a, quote, reasonable price if the trees are destroyed. And as our brief points out, Bader is very much the landowner here. Counsel, this is Judge Smith. Does it matter if the plaintiff is not the landowner? We don't think it does, because this rule is based on the speculativeness of fruit tree production from year to year. It doesn't turn on who's the owner or not. If I may reserve? Yes, you may. Thank you, Mr. Catt, y'all. Ms. George? Thank you, Your Honor. May it please the court. First, I want to point out by saying the facts in this case are unique, but the law is absolutely not. And the district court never said that there was a novel application of law here. What the court said was that longstanding negligence law applies to this case. And what negligence law requires is causal connection between the defendant's conduct and the plaintiff's injury. That's what their own case zapped. The Missouri Supreme Court said. The Supreme Court said actionable negligence requires a causal connection between the conduct of defendant and the resulting injury of plaintiff. Their own cases that they cite counsel a reversal here actually show why the district court got this right. Blanks v. Floor explained. In a negligence case, it is irrelevant which particular lead particle injured any of the plaintiffs. What's relevant in a negligence case is whether the plaintiffs were injured by the conduct of the defendants and whether the plaintiffs can identify the defendants as an actor in the production of their harm. That's the relevant question here. We did not dodge any element of proximate cause or actual causation. This is Judge Smith. As I understand the appellant's argument and how they have approached this, I think they're emphasizing that it wasn't just their conduct that was involved here. The conduct and potentially even illegal conduct of third parties intervened in what might normally have been a routine proof of causation from their behavior, but that regardless of what they may have said in motion, someone else stepped in and was the true culprit for the harm suffered by the plaintiffs. Why are they incorrect if they are? Understood, Chief Judge Smith. The reason that they're correct is because they wholly ignore the Missouri Supreme Court's holding in Shible and many, many other cases in Missouri which uniformly hold that an act of a third party, even where criminal, is not intervening and superseding to cut off the proximate cause chain when the defendants knew it was going to happen. Here, we only have to show that they knew that in this particular case with peculiar circumstances of the case, this is what the Missouri Supreme Court says in Shible, that these farmers may be particularly tempted to do something. Here, we showed that these defendants, Monsanto particularly, knew a full 50 percent of farmers planned to spray over the top. Their executives considered it as one of the risks of launching the seed without an approved herbicide. They wrote it in their launch meeting presentation. They took a boat, went ahead anyway, left the meeting and called themselves renegades and hoped their pink sticker would keep them out of jail. They knew these farmers were going to spray and they knew the only herbicides available to them, the dicamba that they were going to spray, was specifically denied an approval by the EPA for being too volatile. What they knew in 15 played out. At the end of 15, they admitted with each other the off-label spraying was widespread and they doubled down and did it again in 16. So, any plausible deniability that they foresaw these third-party acts, any argument they even had in 15 has gone by 16. What did they also say? Plaintiff's Appendix 301. Internally, they talked with themselves at Monsanto and they say, before the growing season of 16, we know, they use this word realistically, the state agency's investigations and fines are not going to stop the off-label spraying that is getting ready to happen in 16. Only we have the ability to do it. We could announce ahead of time that we will pull the tugs, the licenses of these farmers and that would be a strong deterrent. Monsanto considered it briefly and said no because it would cost them too much in sales. That's the evidence that the jury credited. That's the evidence about which defendants say nothing in their appeal and that's why their appeal fails. Counsel seemed to contend that they didn't have the legal authority or the legal ability to do that. Was evidence of that put into the record? No. Your Honor, it's patently false. The evidence in the record shows that they write the license and they can prohibit anything they want, whatever they choose to prohibit. And in the same exhibit, the launch meeting presentation where they said this is going to be a problem on plaintiff's exhibit 1223, which is the page just preceding their admission 50% will spray. The very first thing they say they should do is an addendum to their top. The very first thing they say they should do is an addendum to the tub to prohibit violation of state labels. So they either did it, in which case it was actionable under their license, or they chose not to. Either way, they were negligent in failing to exercise ordinary care and their conduct in doing so is where liability flows in this negligence case. There is no requirement that plaintiffs identify which particular dicamba landed over their extended seed when all of it was enabled by their conduct. None of it. Does that argument play to both? I understand your position as to Monsanto. What about because there was only one dicamba tolerant seed at play here in the cases? I understand the evidence. When you turn to the dicamba, there isn't only one form of dicamba, correct? It's not only BASF's dicamba, for example. Does that matter when you've described what Monsanto was predicting would happen with the off-label use and the widespread use of dicamba? Does that also apply to BASF? It does. Judge Kelly, I'd like to unpack your question a bit because there's two things. First, they were a partnership in commercializing all of this. We need to understand that Missouri law requires us to causally connect their conduct with the injury, but here they're also connected with the entire system and the injury producing agent, which is the system. BASF owns the dicamba molecule. Every dicamba herbicide on the market is only on there because BASF allows it to be, or has a license agreement, or a contract with someone allowing them to put this in the market. There are not absent manufacturers that are not causally connected to BASF. Same is true for the extended seed. Every seed contains Monsanto's owned proprietary dicamba tolerant seed trade. These two defendants are causally connected to the system and every component in it, but their liability flows from their conduct in commercializing it and the components of it knowing exactly what was going to happen. Can I interrupt with a question right there as you're developing your answer? Maybe there's a very simple answer to this that I just don't understand, but then why the difference between 2015 and 2016 and 2017 onward? If, in fact, they are jointly commercializing and marketing this in such a way that they cannot be separated from your position. Right. Your Honor, our position is we submitted the claim against Monsanto in 2015 and 2016 because Monsanto did, with BASF's authority, commercialize the extend tolerant seed, the incomplete system, knowing full well what farmers were going to do with it. Their contracts, by contract, BASF said to Monsanto with equal vote, we allow you to make that decision. But we submitted the claim only against Monsanto because Monsanto was the one who put that extend seed, that incomplete system into the market. The liability for 15 and 16 flows to its co-conspirator and joint venture, BASF, by operation of law. And what BASF was doing, its co-conspirator and joint venture in 15 and 16, was dumping into the market clarity herbicides, which the EPA had just said are too volatile to get labeled. So while Monsanto was commercializing the seed and that incomplete system is the claim that was submitted to the jury, important to consider for purposes of the conspiracy and joint venture claim are that BASF was not idle in those years. It was very active in perpetrating the harm that happened here. That's why their liability flows by operation of law through the conspiracy finding and the joint venture finding. And if I didn't answer your question, please let me know. Well, counsel, before you, while we're at a little break here, if you just look at instructions 9 and 10, where in there can they argue that the amount of fault, I'm going to be very plain here, the amount of fault that's attributable to the farmers being crooks, disobeying the labels, spraying the stuff, doing things wrong. Do you mean where in here would that come out? Yeah, yeah, yeah. Where in instructions 9 and 10, right? Those are two verdict directors, I think. Correct. Now, I keep reading them, and you may know, I bet you do, that Missouri puts comparative fault in everything, even products liability. I could give you lots of examples, wouldn't accomplish anything here today. But this does accomplish something. Where in there can these defendants someway say that they're at fault here, too? Where does that play into this? Where do you put this in this rubric? Because that surely should be taken into account. Sure, Your Honor. And judgment in the MAI 1901 modification of this jury instruction. And as you know, this instruction is the MAI for negligence time. And it's modified by the 1901 modifier for multiple causes. The directly caused or directly contributed to cause modifiers reflected in there. So as you know, under Missouri law, their liability, Monsanto and BASS liability, is not abrogated just because a contributor acts, which combines with their negligence and causes an injury. That doesn't get them off the hook, right? And it doesn't cut off the chain approximate cause, especially when they knew the likelihood was that it was going to happen. An injury would be the natural and probable. So you're saying the argument against that, and I know you're not a defense lawyer, but you're saying the argument against that is indirectly. That they should argue something was going on indirectly? Are you putting all the freight on the word directly caused, directly contributed? And maybe I don't under maybe I don't understand your question. Part of our theory of the case, which when the evidence is laid over the Missouri approved instruction on this, allows them to argue and defendants did argue that they weren't at fault. This was the responsibility of third party farmers. We warned and we'll get to the lack of warning later, but they made all of these arguments and this MAI is structured so that they can argue all of these facts along the way. But only the ultimate facts are instructed on here. Well, you know, my question is simple. I guess it's it's extremely simple minded. But normally MAI allows you, you know how it works, to take some word or two in here and argue the position both ways. And as you know, Missouri's against controversies. We won't go there. But but so I'm just asking you where in here on these two instructions they argue. Are you telling me it's in the directly caused or directly contributed? Where where can defendants argue that? Yeah, yeah. Where did the defendants get a point to this instruction? You know what they're supposed to be able to do with the MAI instructions. They're supposed to be able to point to something in here and be able to argue their position. Where is it on nine and 10? They can point to the causation. It's assumed within the causation instruction. We didn't directly cause or contribute to cause. That was other people. We didn't fail to exercise ordinary care. It's in there twice. It's in. Did they breach ordinary care? No, they could argue and they did argue. There was no failure of ordinary care because in their minds they acted reasonably and they shouldn't have foreseen that harm would result to third party farmers because they were reasonable and expecting that their their purported warnings would be followed so they can argue it as it goes to a breach of the duty and they can argue it again as to it goes to causation because Missouri Supreme Court has said like it did in Callahan. We don't include things like proximate cause and phrases like that. We leave that for juries for argument to the jury and for attorney argument to courts about whether or not there was a submissible case. And unless no juror could agree, we let that jury decide causation and the attorneys can argue the facts within the confines of the instruction. And they certainly had the opportunity to do that and did. So the outcome. You're well aware that the Callahan case cuts off causation at some point. You're arguing for a very broad causation and in one point of that opinion is to cut it off at some point. And we don't believe we are arguing for a broad interpretation of causation. In fact, we think here we can't look at it. We have, as you just said, you know, recently in the Olson case, Judge Benton, you look at these instructions of the whole and you consider the jury substantive findings. None of these are viewed in a vacuum. They're viewed considering the evidence in the case. There is a substantive finding in this case from the jury that these two defendants agreed to and did develop and commercialize the decamba tolerance system with the expectation that off target movement and damage to farmers would drive their own sales. That's a substantive finding of the jury. And without regard to whatever this court's opinion of the conspiracy claim is, even though it's fully supported by your recent ruling, Judge Benton and Olson, that substantive finding can't be disregarded unless there's a complete absence of probative fact. And here the court, the district court held there was clear and convincing evidence to support that finding. Any one of their arguments on causation is belied by the jury's substantive finding. They expected this exact harm to happen and to drive its sales more than expected it. They premeditated it and they did it in direct contravention of their warnings of their own internal scientists and employees who said we're going to be defending this in court. So I want to address the warnings as well. As this court knows, in Missouri, there's a difference between a use instruction and a warning. A use instruction is not a warning unless it apprises users of the dangers and the risks associated with failing to follow it. There was none of that in this case. That's Missouri Supreme Court law in Nestle Road, which is discussed in our Johnson v. case, which also discusses it. Here, Monsanto knew it was giving no warning at all. Monsanto knew it also gave the same non-warning the very next year. And it didn't work in 15 because that spraying was widespread and going to be rampant and they did nothing to add any of the risks. Do not spray is a use instruction. That didn't cut off their liability in this case. And if I would, would you address the damages issue and particularly the sufficiency of the evidence to establish damage at the levels that were imposed, given looking at the figures about the profitability of beta farms over the years and the multiple factor damage that of the damages historically over what was what was likely to be profitable, the profitability of the farms. How is that? How is it? How is that evidence that was in this case sufficient to establish damage at the level imposed? Yes, Chief Judge Smith, all of those that evidence that you just discussed in the argument around that was all presented to the jury. Also presented to the jury was expert testimony of Dr. Gunther. And you'll note that the defendants elected not to call an economist to rebut the expert calculations of Dr. Gunther, who is skilled in valuing losses to orchards. Right. And he talked about the relevant standard to consider. And he testified that the tax returns are not an indicator of lost profits, just like 80 percent of its distribution centers and they would have no lost profits. So he explained how that works. And just like the Supreme Court in Wondersea held, you know, damage damages can be supported by evidence beyond what's contained in tax returns. And it's not speculative. So long as the plaintiff offers enough information of historical records, historical profits, historical earnings, and then what has happened afterward in order for the jury to make a decision. Here, the jury had all of this evidence and arguments about the tax returns was properly instructed with MAI 4.01, which, as you know, applies to claims when the damages are not simply to real property or to property itself. Here, they were instructed that they can award, as Missouri law allows, any damages that plaintiff is reasonably certain to sustain in the future. That eliminates the concerns about speculative. They were allowed to argue. BASF and Montana both argued it was speculative. They both argued that, you know, Bill Bader didn't know how to farm peaches, even though he'd been farming them for decades and supplying eight states. So that was all evidence for the jury to weigh. They also applied the correct method. The district court. There is no longstanding cap on damages for fruit trees to the diminution in value. That's simply a misstatement of law. In fact, the Missouri Supreme Court in Matthews at around the same time as these cases in the early 1900s were talking about applying a diminution in value. The Matthews court, the Supreme Court said, look, we know the diminution in value method has been applied in fruit tree cases. However, we believe the better method when you're able to ascertain a value of what is either grown or erected on a piece of property, the better method for affording damages is to value what actually has been damaged, including if it's crops. And then the court says no rule is just which does not afford adequate compensation to the plaintiff for his injuries. That's not just antiquated Missouri Supreme Court rule in the 70s. Again, the Missouri Supreme Court in the Wash U versus Alco case quoted that same proposition of itself that itself made in Matthews and said this is still the rule. Even the cases that defendants cite, the Washington University case was not a fruit tree case, was it? No, it wasn't. You're on. Yeah, I didn't think so. Go ahead. You're right about that. That had to do with the destruction of buildings that were erected on the right. And so here we have that's why I think the district court looking at all of this said, clearly, the Missouri Supreme Court does not want to achieve an unjust result here. That would not be just fair firms does not even own the land. Their site, some testimony in his direct where he was confused and then have an attempt to an ability to clarify on cross with Monsanto's own lawyers. The testimony we cite is when Bader, Bill Bader testified and clarified to Monsanto's own attorneys that Bader Farms doesn't own any of the land that it farms peaches on. That he does. But he does. Well, there's there are different trusts and there are 85 percent or something, doesn't he, counsel? We don't need to do trivialities, right? Right. But we don't think that the corporate form is a triviality judgment. And we think that's an important distinction. And I think that's what Cooley was saying. At a minimum, it highlights the inappropriateness of trying to force the round peg of the lost damages claims in this case into the square hole of some cases from the early 1900s where farmers who for all appearances were subsistence farming and trading their fruit with no evidence of lost profits presented no expert testimony to support a lost profits claim and no pending lost profits claim. Those cases just don't fit here. And the district court correctly. Counsel, what about the cases that talk about the fact that it's it's too speculative to try to count up damages for future crops that someone can't. So this is kind of a combination of a land based property value because of the trees, but also you've got that annual crop value, meaning annual every year where you're actually getting the whatever peaches you get out from them in that combination. But you still have to. Did this overvalue the the future crop profits? It's not by not fact by only giving the oh one instruction. Understood, Judge Kelly. And no, here it didn't overvalue it. The difference in the cases that you cite where they say, you know, that that future crops may be too speculative. They were talking about that particular case said the future crops that may have been planted is a step too far here. What we have is a business that has a decades old peach operation with trees that have been growing and maturing for decades. He has an established record. It would be akin to saying that Minute Maid had all of its orchards and fruit grows here and Monsanto wiped them out with dicamba that they even they couldn't supply millions of dollars of juices to states that they can only get the change in value of their land. It's not speculative. It seems to me that the value of the land may incorporate its ability to to make oranges that then go into the highly lucrative orange juice business. So it seems like that's a part of it. But I just wonder if this particular instruction let that overtake it. And we don't think so, because what happened is they were given an instruction that said, you're only allowed to award him the damages that he's reasonably certain to sustain. That Bader firms is reasonably likely to sustain in the future. They had the opportunity to argue that that was too speculative. But here we had an established history of profitability, millions of dollars in annual self sales and peaches. And so at that point, it becomes a jury question. And when they're properly instructed that they're not allowed to speculate, juries are assumed to follow the instructions. So unless there is a complete lack of probative evidence to support this, then submitting that to the jury with that instruction was actually proper. Counsel, I want you to be sure to address BASF's point. You heard it here. BASF's point that, boy, the punitive damages against them seem out there. So what do you say to that, based on how you structured the case and structured it from the very beginning, relying in 15, 16 on Monsanto, and then after then on, this was the only time you brought BASF in. So how can this punitive damages be sustained against BASF, perhaps at all? It's by operation of law, Judge Benton. As the Missouri Court of Appeals explained in Blank Speed Floor, the Uniform Partnership Act is where this derives from. And partners are jointly and severally liable from all the damages that flow from the acts that occur in the scope of the partnership. The district court correctly held there was ample evidence that their acts, all of which were in evidence in the case, all of the evidence of their acts were in furtherance of this partnership. Therefore, this isn't a discretionary situation where—I'm sorry, you're going to— warming up. But counsel, that's Missouri law. Now, we got the due process and is interpreted by Supreme Court. And as you know, conspiracy, it's clear that you have to show it for each conspirator. So tell me why due process doesn't mean that for each joint venture, you have to show it when you get to big punities. Because due process requires that the punitive damages be based upon the conduct in the case and fall within the other constitutional parameters. Here, the claim was submitted against Monsanto. The jury awarded an amount under state law that it felt was necessary to adequately punish Monsanto and deter it and others from like conduct. That's the law. The due process check on that is, could BASF have reasonably anticipated this punishment? BASF is their partner. BASF, this Blanks v. Flora case, the Uniform Partnership Act case, which holds partners liable for the obligations of the partnership, where in 2014, Uniform Partnership Act far predated that. They are on notice that when you enter a partnership, we all are. All of us have been partners in something at some point. We're on notice that we're responsible for that liability. There's no federal due process line of cases that alleviates partnerships from responsibility for the obligations of their partners. In addition to that, with their other arguments regarding due process, the four to one ratio, there's ample evidence to support that in this case. What the district court did was actually refused to do what they're accusing him of. He did not engage in a formulaic cutting. He actually walked through all of the Gore factors, found reprehensibility was established, said that he needed to reduce it because this wasn't a physical injury case, and applying all these factors said that four to one accords constitutional due process while still preserving the state's interest in punishment and deterrent. The court refused to throw the baby out with the bathwater. And this court, the Eighth Circuit has regularly held that you actually do consider the state's interest when you are still getting within the federal constitutional due process requirements, like in Quigley. The Eighth Circuit actually increased punitive damages from a 1.5 to one ratio to a four to one ratio because that would be within constitutional due process and still accord the state's interest in punishment and deterrent. This is important. This is not throwing the baby out with the bathwater and simply saying a formulaic one to one ratio. And as this court knows, the State Farm case did not in any way say that one to one is the constitutional limit in multimillion dollar cases. State Farm said, we recognize that maybe in certain cases in multimillion dollars, that could be the outermost one. It depends upon the case. Here within the Eighth Circuit, the current constitutional limit for multimillion dollar cases is set forth in Eden Electric. It's 4.8 to one ratio, higher than we have here in a purely economic harm case. No physical injury. Defendants like to highlight that there was a threat of physical injury in that case. There were a lot of bad documents in this case, too. Go ahead, Chief. Was there something in the record tying the quantity of punitive damages to the revenue received by the joint venture and joint venturers? No, the discussion really was the amount that would be necessary to punish and deter. And do you mean the division of the liability between the two? I think that's okay. And your honor, these companies had the ability, these defendants had the ability to request that allocation, and they didn't. So the ratio here that the court applied was the proper analysis. The $15 million reflects the entirety of the compensatory damages for an indivisible injury that occurred. Hits in 15 and 16 caused those trees to produce less, even in 17 and 18. They didn't ask. Defendants didn't ask to separate those two on the verdict form because the indivisibility of it was apparent. In addition, the Supreme Court says what you're considering here is not just actual harm. You're considering actual and potential. Certainly the loss of the orchard's revenues, which we've discussed over the 17 and 18 years as well from those 15 and 16 hits, are actual and potential damages that the jury in fact found were sustained by our client, Bader Farms. And I see my time's expired. If there are any other questions, I'm happy to answer. I don't see any. Thank you, Ms. George. Thank you. Mr. Cohn, your rebuttal. Thank you, your honor. Three very quick points. First, on causation. Approximate cause is not established by the defendant's knowledge of the legal wrongdoing. Missouri made that clear in Finocchio that legal conduct is foreseeable in this day and age that does not give rise to causation. Ashley County and Beretta are in accord. If you did away with that legal principle, syringe manufacturers would be liable because they know some syringes will be used for illegal drugs. Playing card manufacturers would be liable because they know playing cards will be used for illegal gambling. Alcohol manufacturers would be liable because they know there'll be some drinking and driving. That is not the law. It's never been the law. The court rejected novel causation theory. At the very least, as Judge Benton noted, there has to be a new trial because the jury instructions were flawed. Second, on compensatory damages. It is clear with 120 years of Missouri precedent, you cannot get future loss profits for fruit trees. Cooley is a contract case. Also in that case was not future loss profits, but it was the price of the trees. Matthew cited by Ms. George is to the contrary. Measure of damages when fruit bearing trees have been destroyed is diminution of the market value of the property. Since then, you have Doty, Adam, Couch, Butcher, Bards, Beatty, all in accord. You cannot get future loss profits. You might get the value of the crop on the trees, but you can't get future loss profits. They're too remote, too speculative. This case is emblematic. Bader Farms is still in business despite what Mr. Gunther said. It is too speculative. You cannot get future loss profits. Finally, punitive damages. We follow the regulatory regime. As Mr. Katyal said, this is Alcorn on steroids. You cannot have punitive damages against anyone. But going finally to the allocation issue, this entire case was premised upon joint conduct, joint venture, conspiracy, and a system. The punitive damages were likewise premised on that. BASS's own trial counsel said the punitives would be against both of us. There should not be any punitive damages. But if the court has questions on the allocation issue, then the proper response is a new trial, at least on punitive damages, if not on everything. Robertson Oil would counsel in favor of a new trial, at least on punitive damages, because we do not know what conduct was the basis for the punitive damages. And Western Fireproofing counsels in favor of a new trial on everything. Again, there should not be any punitive damages against anyone, but at the very least, it would have to be a new trial. Unless your honors have questions, I'm happy to rest on the briefs. Thank you very much. Thank you, Mr. Cohn. Mr. Katyal, you're rebut. You're muted. So sorry, four points, your honors. First on Lopez, no punitive should have been awarded at all. I didn't hear an answer from my friend, Ms. George. This is Alcorn case, not for sure. And these are legal challenges. They're not sufficiency of the evidence challenges. Alcorn is a legal challenge. Brown and Williamson on compensatory and the ratio is a legal challenge. There is no four to one ratio case when you have conduct like this. And certainly there shouldn't be such a verdict against BASF. The cases she cites are ones where there are low compensatory damages. Our state farm point holds that when you have high compensatories, the ratio is one to one or something close to it. Second, there was no joint venture. They don't cite a single case ever saying a Missouri court has found a venture in the face of an express disclaimer. None of the requirements for an implied one are even met. There's no sharing of profits, losses or equal control. Ms. George says BASF owns the molecule and licensed it. Boy, that's wrong. The molecule is a generic and was in 2015. That's trial transcript 251. And if licensing created joint ventures, we'd have bazillions of joint ventures. That is flatly not the law, Ritter is. Third, on joint liability for punitives, BASF had nothing to do with the seed release, which is the only basis for punitives. Judge Kelly, the trial judge, specifically found two distinct periods of liability and specifically found the jury wouldn't be confused by this. That's trial transcript 2329. And Judge Benton, you were absolutely right. Quote, the way Bader structured this case was against Monsanto, not us. They said it would be three hours and 24 minutes of their three week trial against us. And certainly nothing with respect to the punitive damages piece of this. The district court got it wrong by overreading the partnership statutes, disregarding the specific 0.67 punitive damages one. And as Judge Benton pointed out, my friends who are on the other side would mean conspirators would be treated better than joint ventures. That's the Missouri Compare case. That joint liability theory flatly violates due process. And Judge Benton, we think the 0.67 statute has to be our red, our way to avoid a constitutional difficulty under the Ashwander Canon. And the 0.67 statute wasn't even mentioned in the blanks case. And certainly it didn't deal with the kinds of due process concerns that we have raised here. Now Monsanto then at the end of the rebuttal said we need a new trial. That is not correct. There was only one theory of punitive damages in this case. The Monsanto seed release and BASF had nothing to do with that. That was stipulated at joint appendix pages 743 and 785. And the jury instructions directed the jury only to consider Monsanto's conduct. No one is appealing that instruction. And that is why Monsanto's case is boomerang. Robertson Oil is a case of undifferentiated conduct where one couldn't tell from the jury verdict form which defendant did what. And here there was only one actor's conduct before the jury, Monsanto's. And the jury was instructed to look only at Monsanto's conduct. Western fireproofing. The Monsanto omits from the case the key words quote, in the circumstances of this case. Here Monsanto isn't appealing the punitive damages instruction. And docket 119 was always the rule. The district court made a legal error on joint liability. It must be reversed on that basis. And the last thing I'd say is consider the incentive created by all of the Bader theories. The record here shows BASF took so many measures. They even told their employees they'd be fired if they recommended off-label use. They trained tens of thousands of applicators on the best practices, gave hundreds of thousands of nozzles away to minimize drift. If you impose liability on actors like BASF and the kind of undifferentiated causation or joint punitive liability, you're eliminating those incentives for good behavior and conversely incentivizing third parties like sprayers and all the like to do more spraying and reduce the incentive for research and development that the amicus briefs say is the real way to deal with these problems. Thank you, Mr. Catt, y'all. Thank you also all counsel who have participated in an argument this morning. The court appreciates the argument you've supplied to us in supplementation to the briefing materials and the record materials that we already have been studying. We'll take the case under advisement and render decision in due course.